# United States Court of Appeals for the Federal Circuit

SCRIPTPRO, LLC AND SCRIPTPRO USA, INC.,
*Plaintiffs-Appellants,*

v.

INNOVATION ASSOCIATES, INC.,
*Defendant-Appellee.*

2013-1561

Appeal from the United States District Court for the District of Kansas in No. 06-CV-2468, Judge Carlos Murguia.

Decided: August 6, 2014

TRAVIS W. MCCALLON, Lathrop & Gage LLP, of Kansas City, Missouri, argued for plaintiffs-appellants. With him on the brief were A. JUSTIN POPLIN, R. SCOTT BEELER, and JENNIFER M. HANNAH, of Overland Park, Kansas.

ANGELA D. MITCHELL, Shook, Hardy & Bacon L.L.P., of Kansas City, Missouri, argued for defendant-appellee. With her on the brief were B. TRENT WEBB and CHRISTINE A. GUASTELLO.

Before TARANTO, BRYSON, and HUGHES, *Circuit Judges.*

TARANTO, *Circuit Judge*.

Plaintiffs ScriptPro, LLC and ScriptPro USA, Inc. (collectively, ScriptPro) sued Innovation Associates, Inc, alleging infringement of claims 1, 2, 4, and 8 of U.S. Patent No. 6,910,601. The district court granted summary judgment for Innovation Associates, holding that the asserted claims were invalid under 35 U.S.C. § 112, ¶ 1 (now § 112(a)), which requires, for a claim to be valid, that the patent's specification describe the subject matter defined by the claim. The court rested its holding on a single conclusion—that the specification describes a machine containing "sensors," whereas the claims at issue claim a machine that need not have "sensors." S*criptPro LLC v. Innovation Assocs., Inc.*, No. 06-2468, 2012 WL 2402778 (D. Kan. June 26, 2012). ScriptPro appeals. Because summary judgment of invalidity on that ground is not appropriate here, we reverse. We do not have before us, and therefore do not address, other questions that may be raised by the generality of the language of the claims.

BACKGROUND

The '601 patent describes as the invention a "collating unit," which works with an "automatic dispensing system" that automatically fills and labels pill bottles or other prescription containers. The collating unit has a number of storage positions (*e.g.*, slots) into which containers are placed as they emerge from the dispensing system. "The unit stores prescription containers according to a storage algorithm that is dependent on a patient name for whom a container is intended and an availability of an open storage position in the collating unit." '601 patent, col. 4, lines 22-25 (summary of the invention).

In addition to noting that the invention enhances accuracy and efficiency for pharmacies generally, *id.* at col. 6, lines 21-32, the patent emphasizes patient-specific collating as an advantage: the collating unit "can collate

and store multiple containers for a patient within the same area." *Id.* at col. 6, lines 37-38. The patent describes this feature as an improvement over the prior art, which (1) stored only one prescription container in each holding area and (2) stored the prescription containers using a container-specific, not patient-specific, identifier. *See id.* at col. 3, lines 4-8. In this court, ScriptPro emphasizes that this ability—correlating a specific holding area to a specific patient—is one of the primary goals of the '601 patent. *See* Br. of Appellant 23, 28.

The claims included in the original application issued without change. As issued, the '601 patent had 21 claims. All began with the same preamble—"A collating unit for automatically storing prescription containers dispensed by an automatic dispensing system, the collating unit comprising . . ."—followed by a list of required elements. For example, claim 1 read:

> 1. A collating unit for automatically storing prescription containers dispensed by an automatic dispensing system, the collating unit comprising:
>
>> a storage unit for storing the containers delivered by an infeed conveyor;
>>
>> a plurality of holding areas formed within the storage unit for holding the containers;
>>
>> a plurality of guide arms mounted within the storage unit and operable to maneuver the containers from the infeed conveyor into the plurality of holding areas; and
>>
>> a control system for controlling operation of the infeed conveyor and the plurality of guide arms.

Original '601 patent, col. 15, line 58, to col. 16, line 2. Some additional language was added to claims 1, 2, and 4

(but not to claim 8) when the claims were reexamined, but no party has suggested that the amendments bear on the issue currently before us.

The issue before us involves "sensors." Like the just-quoted original claim 1, the claims asserted here do not require "sensors." Other claims of the '601 patent do require the use of a "plurality of sensors" to (with minor variations in the language used) "sense the presence of the containers stored in the collating unit." '601 patent, col. 16, lines 58-59 (claim 9).

According to the specification, "[t]he collating unit of the present invention *broadly includes*" several components: "an infeed conveyor, a base, a collating unit conveyor, a frame, a plurality of holding areas, a plurality of guide arms, *a plurality of sensors*, and *a control system.*" *Id.* at col. 4, lines 26-29 (emphases added to highlight terms of interest to the analysis). *See also id.* at Abstract (the invention "broadly comprises" several components, including "a plurality of sensors"). The patent states: "The plurality of sensors"—at the holding areas—"are operable to determine the presence of a container within the collating unit." *Id.* at col. 4, lines 61-62. The patent describes how, "[i]n operation," when a container for a particular patient comes out of the dispensing system, "[t]he control system" of the collating unit

> determines in which holding area to store the container. The selected holding area is dependent on whether previous containers for the patient have been stored in the collating unit and not yet retrieved. If containers for the patient have already been stored and not yet retrieved, the control system determines if the holding area has space to store the additional container.

*Id.* at col. 5, lines 40, 46-52. The patent then adds:

> To accomplish this, the sensor positioned at the open end of the holding area determines if the holding area is full. If the holding area is not full, the container is stored in the holding area. If the holding area is full, or if no container for the patient has been stored and not yet retrieved, the control system selects the first empty holding area for storage of the container.

*Id.* at col. 5, lines 52-59. Having described placement of a container into a slot, the patent also addresses retrieval:

> When an operator of the collating unit desires to retrieve the container from the holding area, the operator may input the identifying information for the prescription, such as the patient's name, into the control system via the input device. Alternatively, the operator may scan the bar code on the paperwork of the prescription . . . . The control system then instructs an indicator . . . to flash, which indicates the holding area location of the desired container.

*Id.* at col. 6, lines 11-20. Those descriptions appear in the "summary of the invention." Additional language relevant to the issue presented here appears in the description of preferred embodiments.

In October 2006, ScriptPro brought this infringement suit against Innovation Associates, which competes with ScriptPro in selling machines for automatic dispensing of prescriptions. Innovation Associates counterclaimed on various grounds, including invalidity. Shortly thereafter, Innovation Associates initiated an inter partes reexamination of the '601 patent at the United States Patent and Trademark Office, and the district court stayed proceedings in this case to await the PTO's determination.

On January 4, 2011, the PTO completed its reexamination of the '601 patent. It confirmed claims 1 and 2 as

substantively amended in ways not relevant to this appeal. It confirmed claim 4, formerly a dependent claim, as rewritten to be an independent claim, but not otherwise amended. And it confirmed claim 8 without amendment.

Proceedings in this infringement suit resumed. The district court construed certain claim terms, and the parties filed cross-motions for summary judgment. On June 26, 2012, the district court granted summary judgment of invalidity on the ground that the patent's specification does not describe the subject matter of the asserted claims, which do not require sensors. *ScriptPro LLC v. Innovation Assocs., Inc.,* No. 06-2468-CM, 2012 WL 2402778 (D. Kan. June 26, 2012).

The court agreed with Innovation Associates that the specification indisputably limits the invention to a collating unit that uses sensors to determine whether a particular holding area is full when selecting a holding area for storage of a prescription container. The court concluded: "no reasonable jury could find that the inventors were in possession of a collating unit that operated without sensors." *Id.* at *7. The court rejected, as insufficient to prevent summary judgment, the deposition testimony and (unsworn) report of ScriptPro's expert, Dr. Faddis, who stated that "it is clear from the written description of the '601 Patent that sensors are not required to practice the claimed invention" because, "[f]or example," "the collating unit could simply keep track, in memory, [of] what storage locations are available and simply route the appropriate prescriptions to these locations." J.A. 3191. The court dismissed Dr. Faddis's opinion as "entirely conclusory" and "only offer[ing] an opinion on the ultimate legal issue that is not helpful to the jury." *ScriptPro*, 2012 WL 2402778, at *7.

Although a state-law counterclaim remained in the case for a year, in July 2013 what was left of the case was dismissed. ScriptPro timely appealed, raising only a

written-description issue here. We have jurisdiction under 28 U.S.C. § 1295(a)(1).

DISCUSSION

A grant of summary judgment is reviewed de novo. *Crown Packaging Tech., Inc. v. Ball Metal Beverage Container Corp.*, 635 F.3d 1373, 1380 (Fed. Cir. 2011). "Compliance with the written description requirement is a question of fact," and summary judgment is proper if and only if "no reasonable fact finder could return a verdict for the non-moving party" on the issue. *PowerOasis, Inc. v. T–Mobile USA, Inc.,* 522 F.3d 1299, 1307 (Fed. Cir. 2008).

We have a narrow issue: whether the absence of sensors from the claims at issue means that those claims are unsupported by the written description as a matter of law. We do not have before us other questions that might be raised by the generality of the claim language. We note one such question because it is related to what ScriptPro, in making its present argument, stresses as a central purpose of the invention described in the specification: to keep track of what slots are open and what slots are being used for a particular customer. *See, e.g.*, Br. of Appellant 23 ("one of the primary goals of the invention is to 'associate a stored container with a patient based on the patient's name' and then 'collate and store multiple containers for a patient within the same area'") (quoting '601 patent, col. 6, lines 35-38). It is not immediately apparent how the claim language, properly construed, requires any means of achieving that purpose. We simply assume, for present purposes, that it does.

On the sole issue presented, the starting point is that the specification's description of embodiments having sensors for providing information about slot allocations and availability does not necessarily mean that the only described invention is a collating unit with such sensors. It is common, and often permissible, for particular claims

to pick out a subset of the full range of described features, omitting others. *E.g., Crown Packaging*, 635 F.3d at 1380-81; *Revolution Eyewear, Inc. v. Aspex Eyewear, Inc.*, 563 F.3d 1358, 1366-67 (Fed. Cir. 2009); *cf. Phillips v. AWH Corp.*, 415 F.3d 1303, 1326-27 (Fed. Cir. 2005). A specification can adequately communicate to a skilled artisan that the patentee invented not just the combination of all identified features but combinations of only some of those features (subcombinations)—which may achieve stated purposes even without omitted features.

The specification in this case does not preclude that result as a matter of law. ScriptPro could establish that the written description conveys to the relevant skilled artisan that "the inventor[s] actually invented the invention claimed" in claims 1, 2, 4, and 8. *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010). There is no sufficiently clear language in the specification that limits the invention to a collating unit with the (slot-checking) sensors. And considering what the specification does say, and what ScriptPro highlights as a central purpose of the claimed advance in technology, it cannot be said as a matter of law that claims 1, 2, 4, and 8 have a scope incommensurate with what is described as the invention.

Neither the specification's declaration that "[t]he collating unit of the present invention broadly includes . . . a plurality of sensors" nor the "broadly comprises" language of the Abstract is enough to support the invalidity ruling on summary judgment. '601 patent, col. 4, lines 25-28; *id.* at Abstract. The term "broadly" qualifies the assertion of inclusion. Like "generally," the qualifier "broadly" suggests that exceptions are allowed to the assertion of what occurs most (perhaps even almost all) of the time. The combination "broadly includes" might have a more absolute meaning when followed by an enumeration of examples of what precedes the phrase, *e.g.*, "The term 'law' broadly includes constitutional provisions, statutes,

regulations, . . . ." When followed by a list of individual *components* of the subject preceding "broadly includes," however, the phrase, which is unusual, does not plainly convey such an absolute meaning. Indeed, a less than absolute meaning tends to be suggested by the very fact that the word "broadly" has been included: what is the word doing in the phrase if not to moderate an otherwise-straightforward assertion that the inventive collating unit "includes" the enumerated items? We conclude that the "broadly includes"/"broadly comprises" phrases are less than a clear statement of limitation that a skilled artisan, if being reasonable, would have to read as requiring the slot sensors at issue.

The specification statement that "[t]he plurality of sensors are operable to determine the presence of a container" in the collating unit, *id.* at col. 4, lines 61-62, by its terms says what the itemized sensors can do when they are present. It does not declare that they must be present. Seemingly more helpful to the invalidity challenge, the specification says that "[t]o accomplish" the determination whether a slot has space "the sensor positioned at the open end of the holding area" detects whether the area is full. *Id.* at col. 5, lines 52-54. But that too might be read as saying what the sensor does when it is used, not that it must be used.

Importantly, the just-quoted passages do not stand alone. The specification, in describing preferred embodiments, elsewhere positively suggests that slot sensors are an optional, though desirable, feature of the contemplated collating unit. The specification says: "[i]f the sensor . . . does *confirm* the presence of the container," the collating unit selects the next empty holding area for storage. *Id.* at col. 12, lines 30-33 (emphasis added, figure component numbers omitted). Relatedly, it describes such a sensor as a "*security feature*" to "determine if any container is located in the [holding] area." *Id.* at col. 14, lines 32-37 (emphasis added). Those references to the sensor's func-

tionality tend to suggest that its absence would not prevent the system from working—that whether the holding area is full can first be determined through other means and then later "confirmed" by the sensors. The same suggestion is present in the passage referring to use of sensors to determine whether the collating unit should display an "error message," which seems to presuppose an independent source of the information for comparison. *Id.* at col. 12, lines 6-11. Those passages seem to provide a basis for a skilled artisan to read the specification as characterizing the slot sensors as a desirable, but ultimately optional, feature of the invention.

The suggestion in the particular language just quoted aligns with the disclosure's explanation of functions sought to be achieved by the invention. The claims to a sensorless collating unit cannot be said on summary judgment to be too broad given that disclosure. A skilled artisan may well be able reasonably to read the specification as teaching a specific means of achieving a central stated purpose of the asserted invention without the slot sensors.

As quoted above, the specification describes the "control system" as initially selecting a slot for storage of a particular prescription container based on the patient's identity—which might well be understood to suggest a computer memory in the control system that keeps track of slot-patient assignments. '601 patent, col. 5, lines 46-52. Similarly, the specification describes the control system's receipt of information about what containers have been retrieved from particular slots. *Id.* at col. 6, lines 11-20. Even without regard to whether the control system is preprogrammed to know the capacity of particular slots, those disclosures might be understood to show use of the control system itself to achieve the highlighted functionality without the "confirm[ing]" check of slot sensors. Indeed, the specification, in describing a preferred embodiment, says that "[a]s containers are stored

in the collating unit, the control system . . . stores such information in the memory," so that an operator "may at any time determine which containers are currently stored in the collating unit and the location of the containers . . . ." *Id.* at col. 12, lines 45-51 (figure component numbers omitted).

We understand ScriptPro's expert, Dr. Faddis, to have so stated. He indicated that a skilled artisan would read the specification to disclose a "collating unit [that] could simply keep track, in memory, [of] what storage locations are available and simply route the appropriate prescriptions to these locations." J.A. 3191. While Dr. Faddis's report was not sworn under penalty of perjury, Innovation Associates acknowledges that the district court considered his opinion and does not argue that its decision to do so was an abuse of discretion. *See* Br. of Appellee at 24. In any event, the specification itself creates a genuine issue of material fact on this question: a trier of fact could find that a skilled artisan would understand the specification to disclose a system that relies on the computer memory, without sensors, to fulfill the central purpose of keeping track of slot use by particular customers and slot availability, with sensors optionally providing confirmation only. It is a separate question whether the claims *claim* such reliance, but as already stated, we merely assume the answer to that question, which is not before us.

We note one last point: as originally filed, the application that matured into the '601 patent had claims that did not include a requirement of sensors. When a specification is ambiguous about which of several features are stand-alone inventions, the original claims can help resolve the ambiguity, though even original claims may be insufficient as descriptions or be insufficiently supported by the rest of the specification. *See Crown Packaging*, 635 F.3d at 1380 ("Original claims are part of the specification and in *many* cases will satisfy the written description requirement.") (emphasis added); *LizardTech, Inc. v.*

*Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005) (noting "that an originally filed claim can provide the requisite written description to satisfy section 112," but holding that "nothing in claim 21 or the specification constitutes an adequate and enabling description" despite the fact that "claim 21 is part of the original disclosure"). Here, original claims omit a sensor requirement, an omission that fits the bases in the specification for deeming sensors to be merely optional.

Innovation Associates argues that ScriptPro waived any argument that the originally filed claims demonstrate the adequacy of the written description. We need not decide that issue, however, because we have already concluded that the specification, apart from those claims, precludes summary judgment of inadequate written-description support of claims not requiring sensors. Reliance on the original claims will be available to ScriptPro in further proceedings on this issue.

## CONCLUSION

For the foregoing reasons, we reverse the district court's grant of summary judgment that claims 1, 2, 4, and 8 of the '601 patent are invalid under 35 U.S.C. § 112 for lack of an adequate written description.

**REVERSED**